```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2

 3   CY WAKEMAN, INC., an Iowa      )    Case No. 8:16CV541
     Corporation, Individually      )
 4   and as Assignee of John        )
     Wiley & Sons, Inc.,            )
 5                                   )
               Plaintiff,           )
 6                                   )
     vs.                             )
 7                                   )
     NICOLE PRICE CONSULTING, LLC )
 8   d/b/a LIVELY PARADOX, a        )
     Missouri limited liability     )
 9   company, and NICOLE D. PRICE, )
                                     )
10                                   )    Lincoln, Nebraska
               Defendants.          )    July 7, 2017
11

12            TRANSCRIPT OF TESTIMONY OF CYNTHIA WAKEMAN
                 BEFORE THE HONORABLE JOHN G. GERRARD
13                  UNITED STATES DISTRICT JUDGE

14

15                     A-P-P-E-A-R-A-N-C-E-S

16   FOR THE PLAINTIFF:       Mr. Patrick T. Vint
                              Woods & Aitken LLP
17                            10250 Regency Circle
                              Suite 525
18                            Omaha, NE 68114

19   FOR THE DEFENDANTS:      Mr. Justin W. High
                              High & Younes
20                            6919 Dodge Street
                              Omaha, NE 68132
21
     COURT REPORTER:          Ms. Rogene S. Schroder, RDR, CRR
22                            111 South 18th Plaza
                              Suite 3129
23                            Omaha, NE 68102
                              (402) 661-7383
24

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer.
```

1          MR. VINT:  Plaintiff calls Cy Wakeman.

2          THE COURT:  All right.  Miss Wakeman, if you would

3     come forward, please.

4          If you'll approach the witness stand, we'll have you sworn

5     in.

6          Come around to the stand and I'll have you take a seat.

7          THE WITNESS:  Okay.

8          THE COURT:  Okay.  If you'd take a seat, make

9     yourself comfortable, adjust the microphone, we'll have you

10    sworn in.

11         COURTROOM DEPUTY:  Please state and spell your name

12    for the record.

13         THE WITNESS:  Cynthia Wakeman.  C-y-n-t-h-i-a

14    W-a-k-e-m-a-n.

15         COURTROOM DEPUTY:  Please raise your right hand.

16         CYNTHIA WAKEMAN, PLAINTIFF'S WITNESS, SWORN

17         THE COURT:  All right.  You may inquire.

18         MR. VINT:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20    BY MR. VINT:

21    Q.   Ms. Wakeman, you go by the nickname Cy; is that correct?

22    A.   Yes.

23    Q.   Okay.  Cy, what's your current address?

24    A.   24913 Chicago Street, Waterloo, Nebraska 68069.

25    Q.   And your place of birth?

Wakeman - Direct                                                              3

1    A.    Belmont, Iowa.

2    Q.    And give the Court a thumbnail of your educational

3    history.

4    A.    I have an undergraduate degree from Drake University in

5    third world economic development.  I have a bachelor's in

6    social work degree from Briar Cliff --

7              THE COURT:  You're going to have to slow up and

8    enunciate a little bit more.

9    A.    Bachelor's of social work degree from Briar Cliff

10   University and a master's of healthcare administration from

11   Clarkson College in Omaha.

12   BY MR. VINT:

13   Q.    Cy, what'd you currently do for employment?

14   A.    I own Reality-Based Leadership -- Cy Wakeman, Inc. doing

15   business as Reality-Based Leadership, and I research, write and

16   provide training and speaking programs and other services as an

17   organization.

18   Q.    In what fields do you provide those services?

19   A.    Predominantly in leadership and employee development and

20   in a variety of fields from high tech, banking, healthcare,

21   government agencies, not-for-profits.

22   Q.    How long have you engaged in that business?

23   A.    Since 1999.

24   Q.    Okay.  What led you to get into the field of leadership

25   consulting and training?

1    A.   As a leader in healthcare, I was asked often to speak at

2    conferences, and as I left my permanent employment and was home

3    with children, decided rather than reentering the work force, I

4    would start my own business.

5    Q.   Okay.  I didn't ask you before.  What were you doing

6    before joining -- or before creating Cy Wakeman, Inc.?

7    A.   I --  My first role in healthcare was as a therapist, as a

8    counselor, and I went on to be a leader in healthcare, and

9    during the time of my master's and work in healthcare began

10   researching drama in the workplace as part of my educational

11   studies and then continued that work with my original content

12   in forming my own business.

13   Q.   What do you mean by being a leader in the healthcare

14   industry?

15   A.   I was a mid-level manager.  I was a leader of healthcare

16   units, clinics and hospitals.

17   Q.   Okay.  And you've engaged in this leadership consulting

18   and speaking business since 1999?

19   A.   Yes.

20   Q.   Describe for me the -- the general business of Cy Wakeman,

21   Inc.

22              THE COURT:  And -- and as you do that, Miss Wakeman,

23   talk to me.

24              THE WITNESS:  Oh, sorry.

25              THE COURT:  He probably knows what you're going to

Wakeman - Direct                                                      5

1    say.  I don't.

2              THE WITNESS:  Okay.  Sorry about that.

3    A.   What was the question?

4              MR. VINT:  Would you please reread the question.

5              COURT REPORTER:  "Describe for me the -- the general

6    business of Cy Wakeman, Inc."

7    A.   As a founder of the company, I conduct research and

8    develop original content that I author books on and develop

9    training programs on, train other people to deliver and then

10   provide services such as engagement surveys, training offerings

11   and organizations and deliver keynotes based on that

12   information.

13        I author books, posts online and articles in major

14   magazines with online imprint.

15   BY MR. VINT:

16   Q.   How many people are currently employed by Cy Wakeman,

17   Inc.?

18   A.   Currently we have nine employees.

19   Q.   And of those nine employees, how many are tasked with

20   creating content or providing speaking -- speeches or keynote

21   speeches as you call them?

22   A.   Five of them are speaking or creating derivatives of my

23   content.

24   Q.   Okay.  Describe what you mean by derivatives of your

25   content.

1    A.    So taking original work that I have done either through

2    research or my experience as a leader in business, they may

3    make a meme or picture for social media, they may create a blog

4    based on that information, they may give talks at

5    organizations, conduct training, create other programs online

6    or in person or certification on my behalf and deliver those

7    programs.

8    Q.    You previously mentioned that the business operates under

9    the alternate name Reality-Based Leadership?

10   A.    Yes.

11   Q.    What do you mean by reality-based leadership?

12   A.    Reality-based leadership is a philosophy of leading that

13   involves what we call ditching the drama and eliminating

14   emotional waste through using good mental processes, and it

15   challenges many conventional wisdoms in leadership and human

16   resources.

17   Q.    The -- is -- is --  Would you describe reality-based

18   leadership as the overarching philosophy of the company?

19   A.    Yes.

20   Q.    And how is that implemented into the products and services

21   provided by the company to its clients?

22   A.    Everything is a derivative of that philosophy.  So we

23   create in-person training and keynote experiences.  We write

24   articles and blogs.  We create videos that we produce and put

25   online.

 1         We have a virtual training program that takes the books

 2    and all the concepts and creates online training programs from

 3    them and we have an engagement survey process that we created

 4    from that work.

 5    Q.   Is the reality-based philosophy summed up in the -- the

 6    two books that you have authored?

 7    A.   It's summed up in those two books and then what happens in

 8    preparation for writing a third book is we research and collect

 9    and develop the newest concepts that we then publish as

10    additional original content.

11    Q.   Do any of the employees of Cy Wakeman, Inc. create

12    original content on their own without your supervision or

13    guidance?

14    A.   No.

15    Q.   Do you consider it your responsibility, as president of

16    the company and as its founder, to make sure that the content

17    created by the company falls within the general philosophy of

18    reality-based leadership?

19    A.   Yes.

20    Q.   Would you -- you -- your second book is entitled *The*

21    *Reality-Based Rules of the Workplace*; is that correct?

22    A.   Yes.

23    Q.   And your first book was *Reality-Based Leadership*?

24    A.   Yes.

25    Q.   Have you published any other books at this time?

1    A.    I've published a book -- I'm not sure, maybe 15 years

2    ago -- a chapter in a book and I would need to go back to get

3    that title exactly correct.

4    Q.    It was a chapter in a -- in a book?

5    A.    A compilation, yes.

6    Q.    Okay.  Describe for the Court the importance of your book

7    or your books to your booking and speaking arrangements.

8    A.    For any speaker, the -- having a book influences greatly

9    the fees that you're able to command in the marketplace.  So if

10   you're speaking without a book, you will have difficulty

11   getting regular bookings and bookings at a competitive rate.

12         Having a book is what most speakers give as advice.  It's

13   called their business card, and it shows that one has original

14   content, and it is a way to put yourself in a different place

15   in the market and also the best way to protect copyright of

16   your own is to publish your work so that it can undergo all the

17   fact-checking and all the things that a publishing house does

18   in the publication of a book.

19         And, lastly, having original content then allows you to

20   make money through licensure which is how a majority of our

21   income through Cy Wakeman, Inc. is produced is that either

22   we're paid in person to deliver our content, but if we train

23   somebody else to deliver our content and they go on to deliver

24   it inside their organizations, they are required to pay us a

25   license fee for every use of our content.

1    Q.    And you mentioned to the Court that -- that Cy Wakeman,

2    Inc. provides speaking engagements, these licensing fees you

3    just described, books and merchandise in the new virtual

4    training platform.

5          Are there any other sources of income or products provided

6    by Cy Wakeman, Inc. to its clients beyond those?

7    A.    You mentioned merchandise.  We do have income that comes

8    also through the sale of video, either digital or online, as

9    well.

10   Q.    Okay.  Cy, at some point in the past, did Cy Wakeman, Inc.

11   hire Nicole Price?

12   A.    Yes.

13   Q.    And as I understand it, she was hired as Vice President of

14   Training; is that correct?

15   A.    That's correct.

16   Q.    Okay.  Give me as the President of -- of Cy Wakeman, Inc.

17   what the intent was in hiring Ms. Price.  What job was she to

18   hold and what role was she to play with the company?

19   A.    As Vice President of Training, she would be speaking and

20   delivering a reality-based leadership philosophy content.  A

21   majority of her time she would also be helping the team with

22   special projects and -- such as the creation of Train the

23   Trainer programs that we wanted to present.  She played a part

24   in that along with graphic designers and other team members.

25         She might be assigned to organize that content in many

1    different ways, whether it was an online delivery or some

2    custom content for clients, so delivering content and special

3    projects in occasion [*sic*] to services and goods on behalf of

4    Cy Wakeman.

5         As Vice President of Training, I also had within her job

6    responsibilities the management and guidance of others and in

7    that hiring with that title had talked to her about even

8    succession planning on my behalf.

9    Q.   Describe for me further what you mean by succession

10   planning on your behalf.

11   A.   That my involvement with the company that I created I

12   would like to phase out over the -- the ten years and was

13   hoping that she'd be part of the ownership I'm granting to all

14   the members of my company through ESOP.

15   Q.   Did Ms. Price at that point offer you any manuscript that

16   she had been providing for review or as a -- an inducement to

17   employment?

18   A.   No.

19   Q.   Did Ms. Price offer at that point any materials she had

20   created in the filed of diversity?

21   A.   No.  At the time of hiring in 2012, diversity wasn't even

22   on our radar.

23   Q.   Okay.  And you kind of anticipated my next question.  At

24   that point when she was hired, had Cy Wakeman, Inc. provided

25   any speaking arrangements, licenses, books, parts of its work

1  training platform related to diversity training or inclusion

2  training?

3  A.   The only thing I had offered in regards to diversity or

4  inclusion training was on podcasts and other interviews what

5  our philosophy would be about, so I offered commentary on the

6  topic and panels or -- but we offered no services or products

7  at that time.

8           THE COURT:  Counsel, what was the date of hire?  I

9  know it's sometime in 2012.

10          MR. VINT:  I believe it was November of 2012.

11          THE COURT:  Pardon?

12          MR. VINT:  November of 2012, I believe.

13          THE COURT:  All right.

14  BY MR. VINT:

15  Q.   At the time that you hired Ms. Price, Cy, did you indicate

16  to her that you wanted to utilize her experience to increase

17  the field of clients that were interested in increasing

18  diversity and inclusion in the workplace?

19  A.   No.

20  Q.   Had you had any clients at that point contact Cy Wakeman,

21  Inc. to discuss a plan for diversity and inclusion in the

22  workplace?

23  A.   No.

24  Q.   How did it become a portion of the Wakeman business to

25  provide speaking arrangements -- or speaking engagements and

1    materials related to diversity and inclusion in the workplace?

2    A.    A client I had since 2007 was asked by her board to ensure

3    diversity and inclusion offering within her organization, and

4    because they were well-engaged with the reality-based

5    leadership philosophy, she asked if there was something that

6    would align with my philosophy to offer rather than some of the

7    more traditional programs.

8    Q.    Did you, in fact, prepare that at that time?

9    A.    Yes.

10   Q.    In what form was it prepared?

11   A.    I and Nicole met with the client together and -- on

12   various occasions, and we -- Nicole offered a plan -- a

13   diversity plan for the client and then talked to them about an

14   offering, and it was agreed at our team that we would create an

15   offering and deliver that offering.

16   Q.    Is that offering the PowerPoint presentation called

17   Reality-Based Diversity & Inclusion that has previously been

18   provided to the Court?

19   A.    Yes.

20   Q.    Did you oversee authorship of that presentation?

21   A.    Yes.

22   Q.    Did you confirm that that presentation included the

23   principles of reality-based leadership?

24   A.    I affirmed that it aligned with the principles and have

25   emails that offer key components that I wanted to make sure

1    were included in the training, yes.

2    Q.   Okay.  Did Ms. Price work with you in creating that --

3    that presentation?

4    A.   She created the presentation.  We had conversations.  We

5    had emails back and forth.  I asked her to write a script for

6    virtual training and then paid for that virtual training to be

7    produced and had commentary towards that and used our graphic

8    designer and others to create the visual assets for that, yes.

9    Q.   Okay.  And when you say "visual assets", you mean the

10   PowerPoint presentation?

11   A.   The PowerPoint.

12   Q.   Describe for the Court --  I kind of skipped over it

13   earlier.  Describe for the Court the virtual training platform

14   and what you mean by having scripts prepared for that platform.

15   A.   Sure.  For each book or program that we offer, we partner

16   with a vendor and take the book and form a derivative of a

17   script and offer a PowerPoint.

18        We go to the vendor and we tape in five-minute to

19   ten-minute intervals a program that they then add their virtual

20   abilities to so that you could buy a license and take an online

21   course that shows myself or one of my employees presenting the

22   information and then also with visual assets like PowerPoint

23   or, you know, other figures on the screen.

24   Q.   And is that all part of the -- the licensing arm of

25   Wakeman's business?

```
 1   A.    Yes.  We sell that by license.  I pay for the scripts to
 2   be developed.  I pay for the PowerPoints to be developed.  I
 3   pay for the filming to happen, the makeup and then we sell that
 4   through licensure.  And we've been doing that since 2012.
 5         So for Reality-Based Leadership, Reality-Based Rules
 6   of the Workplace, we're currently doing that for our third
 7   book and two other programs that are not yet published into
 8   books.
 9   Q.    You mentioned your third book.  Do you have a deal in
10   place to write a third book?
11   A.    I have a deal.  The book is already written.
12   Q.    Okay.  Was that book to include Reality-Based Diversity &
13   Inclusion?
14   A.    Yes.
15   Q.    Was that part of the original for lack of a better term
16   pitch to the publishing company?
17   A.    Yes.
18   Q.    And you said the book is complete, correct?
19   A.    Yes.  It's published September 19th.
20   Q.    Does the book actually include Reality-Based Diversity &
21   Inclusion as currently written?
22   A.    No.
23   Q.    Why is that?
24   A.    When I -- when the issue with copyright was brought up and
25   I shared that with my publisher, because we take copyright very
```

1    seriously, it was decided that we would only write what we knew

2    was in the unchallenged content, and I wanted to play that safe

3    to not prolong my book launch so we -- the publisher asked that

4    we remove that portion of the material.

5    Q.    What challenge was the publisher concerned about?

6    A.    The publisher was concerned --

7              MR. HIGH:  Objection, hearsay.

8              THE COURT:  Overruled for the purposes of this

9    hearing.

10              THE WITNESS:  Will you repeat the question?

11              COURT REPORTER:  "What challenge was the publisher

12    concerned about?"

13    A.    I self-reported to the publisher -- to actually both my

14    publishers who have joined me in the case -- Wiley has

15    joined -- or offered their -- I'm not sure what it's called.  I

16    self-reported to both my publishers that there had been a

17    potential infringement on my copyright of my first two books

18    and some material I was hoping to include in my third book and

19    so the publisher Macmillan, St. Martin's Press, offered the

20    advice that I would publish in the third book without diversity

21    and inclusion material.

22         I have a fourth book that will be published next year and

23    that when this was cleared up, I could include that potentially

24    in the fourth book, if it was still relevant and timely

25    information.

1   BY MR. VINT:

2   Q.   You mentioned that Wakeman, Inc., "takes copyright

3   seriously".  What do you mean by that?

4   A.   I am only here today because my ability to defend my

5   copyright long-term with very large clients and to invoke

6   licensure and payment for licensure depends on my ability to

7   defend it at any infringement.

8        So I'm here today because if I don't defend my copyright

9   today, I may lose the ability to defend it if something more

10  significant was actually coming towards me.

11       So the value of my business is based on my copyright, and

12  as an author with a national publishing house, we are

13  well-schooled on copyright and whatever we publish that --

14  since we don't self-publish, we publish with a national publish

15  house, everything is checked very thoroughly, and any issues

16  are settled prior to publication so that we are assured that

17  the copyright is complete.

18  Q.   Now, has your publisher on the first two books, John

19  Wiley, ever raised any issues involving copyright infringement

20  in the material that was in those first two books?

21  A.   No.

22  Q.   Has anybody else ever raised any issues of copyright

23  infringement on any materials that Cy Wakeman, Inc. has

24  produced?

25  A.   No.

Wakeman - Direct                                    17

1   Q.   Have you had any other persons in the leadership

2   consulting industry contact you indicating that they believe

3   that you have violated their copyright or used their material

4   without permission?

5   A.   No.

6   Q.   Has your publisher on the third book indicated any other

7   issues with violations of copyright based on the material

8   that's currently involved in the book other than Reality-Based

9   Diversity & Inclusion?

10  A.   No.

11           THE COURT:  Counsel, does this third book have a

12  name?

13  BY MR. VINT:

14  Q.   What's the name of the third book, Cy?

15  A.   The book is called *No Ego*.

16           THE COURT:  That was published September 19?

17           THE WITNESS:  It is going -- it's --

18           THE COURT:  Going to be.

19           THE WITNESS:  Yeah.  It will be released -- it's

20  complete with a release date of September 19.

21           THE COURT:  All right.

22           MR. VINT:  And, Your Honor, I think we have stated, I

23  believe in our reply brief, that we would be willing to provide

24  it for an in camera review by the Court if they would like.

25           THE COURT:  Very well.

1    BY MR. VINT:

2    Q.   Cy, you mentioned the job duties that Nicole was to

3    perform as a employee of Wakeman, Inc.  First off, did Nicole

4    receive a salary for her work?

5    A.   Yes.

6    Q.   Did she receive benefits?

7    A.   Yes.

8    Q.   What -- at the time that you hired her, what did you

9    foresee her development being or where'd you foresee her going

10   as an employee of the company?

11   A.   I thought that she would be a candidate for my successor.

12   Q.   Okay.  Did you talk with her at all about the potential

13   for publishing a book at a later time?

14   A.   Yes.  In development talks, in order for her to grow her

15   book of business within my company, she would eventually need

16   to have a book and without original content it's very difficult

17   to break in and get an agent and a national publishing house.

18        And so I said that as part of development, to help her get

19   a higher rate for our organization that I would be interested

20   in co-author -- I offered to co-author a book.

21   Q.   At the time that you offered to co-author a book with

22   Ms. Price, had Reality-Based Diversity & Inclusion been

23   created?

24   A.   I would have to check timing.  I don't know if there was

25   one before the other.  It wasn't in conjunction of if you write

1   this, I will help you publish it.  That is not the case.

2   Q.   And that was my next question is did -- as she assisted

3   with the creation of Reality-Based Diversity & Inclusion, did

4   you make any promises that you would agree to co-author a book

5   with her based on that content?

6   A.   Not solely on that content.

7   Q.   Okay.  The -- Eventually Miss Price completed the

8   presentation.  Did she become the person primarily

9   responsibility for delivering that presentation on

10  reality-based diversity and inclusion?

11  A.   Yes.

12  Q.   And --

13  A.   She and I -- I've delivered it myself as well, but she's

14  the primary person.

15  Q.   Okay.  Was Miss Price initially enthused about that

16  opportunity?

17  A.   No.

18  Q.   Would you describe for the Court the discussions that took

19  place.

20  A.   When the topic first came up, she shared with me

21  reservations about her being cubbyholed into that line of work

22  or that field of work, and we had discussions about whether

23  she -- we should even take on the client that requested it and

24  if that's work that we wanted to have as part of our

25  organization.

1    Q.    Was there any other persons -- were there any other

2    persons in Cy Wakeman, Inc. that were delivering that

3    presentation aside from you and Nicole?

4    A.    No.

5    Q.    And how was the presentation initially received?

6    A.    How was it received?  It was received well.

7    Q.    Do you recall when Miss Price first began delivering that

8    presentation?

9    A.    I don't recall dates.  I can -- I can find those.

10   Q.    I believe that the -- well, let me ask this:  If the

11   record indicates that it was approximately spring of 2016, does

12   that sound correct?

13   A.    Yes.  That was the first presentation at ATD and SHERM

14   conferences.

15   Q.    Okay.  Please notify the Court what you mean by ATD and

16   SHERM?

17   A.    Associated [*sic*] for Training and Development is a large

18   national conference that -- and SHERM is Society For Human

19   Resource Management.  Cy Wakeman puts proposals into those

20   conferences under our name and offers our employees to speak,

21   along with myself, and so when anyone's speaking at those

22   conferences, they're representatives of Cy Wakeman.

23   Q.    And what's the purpose of having your employees go to

24   those conferences to deliver presentations?

25   A.    To help build our business and to increase our bookings

Wakeman - Direct                                                      21

1    and to increase the -- our credibility so that the amount of

2    money paid for our bookings increases.

3    Q.    Okay.  In August of 2016, did you fire Nicole Price?

4    A.    Yes.

5    Q.    Why did you fire Nicole Price in August of 2016?

6    A.    I had found evidence that she had started a competing

7    business, had incorporated that business, had shared

8    confidential company information and intellectual property

9    outside of our work -- or our business and was -- basically had

10   begun a competing business and was not forthright with me when

11   I inquired about that in a few months prior.

12   Q.    Do you have any objection to Ms. Price running a business

13   that provides leadership consulting?

14   A.    Not at all.

15   Q.    Do you have any objection to her providing keynote

16   presentations?

17   A.    No.

18   Q.    Do you have any objection to Ms. Price publishing a book?

19   A.    No.

20   Q.    Cy, you've mentioned why you are -- why you're here today

21   and why you believe that protection of copyright is so

22   important.  Are you of the belief that the licensing portion of

23   your business would be at risk if your copyright is not

24   protected?

25   A.    Potentially, yes.

Wakeman - Cross                                                    22

1    Q.   Is it your understanding that -- that copyrights have been

2    filed for both of your -- your actual books as well as the

3    presentation Reality-Based Diversity & Inclusion?

4    A.   Yes.

5    Q.   Have you received any other challenges to those

6    copyrights?

7    A.   No.

8    Q.   Do you -- have you been notified by anybody from John

9    Wiley of any challenges to those copyrights?

10   A.   No.

11              MR. VINT:  That's all the questions I have, Judge.

12   Thank you.

13              THE COURT:  Very well.  Cross-examination.

14              MR. HIGH:  Yes, Your Honor.

15                          CROSS-EXAMINATION

16   BY MR. HIGH:

17   Q.   Do you prefer Mrs. Wakeman or Ms. Wakeman?

18   A.   Ms. Wakeman.

19   Q.   Mrs. Wakeman?

20              THE COURT:  Is the -- is your microphone on?  I can't

21   tell.

22              MR. HIGH:  I'm sorry.

23              THE COURT:  Thank you.

24              MR. HIGH:  Sorry about that.  Is that better?

25              THE COURT:  Very well.

1              MR. HIGH:  Okay.

2    A.   Ms., please.

3    BY MR. HIGH:

4    Q.   Ms. Wakeman?

5    A.   (Nods affirmatively.)

6    Q.   Okay.  Ms. Wakeman, you said that you've authored three

7    books and two of them have been published already; is that

8    right?

9    A.   I've authored a chapter in one book.  I've authored three

10   books in addition to that chapter.  Two have been published and

11   the third one is released September 19th.

12   Q.   Okay.  The first book was called what exactly?

13   A.   The first book -- as I said, I would need to check the

14   title.  It was something -- a chapter in a book.

15   Q.   Okay.

16   A.   It was a compilation.

17   Q.   The first full book that you wrote.

18   A.   Was called *Reality-Based Leadership*.

19   Q.   Okay.  About how many copies of that book --

20              THE COURT:  That was called what?

21              THE WITNESS:  *Reality-Based Leadership*.

22              THE COURT:  Oh, okay.  That's what I had before.

23   Thank you.

24   BY MR. HIGH:

25   Q.   About how many copies of that book have been sold?

1    A.    I would have to check current numbers.  I would say

2    25,000.

3    Q.    Okay.  And the -- the second full book.

4    A.    *Reality-Based Rules of the Workplace*.

5    Q.    About how many copies of that book have been sold?

6    A.    About 21,000.

7    Q.    Where do your numbers come from, the 21,000 and the

8    25,000?

9    A.    The -- there's a national organization called BookScan,

10   and those show any books sold through any retailer that

11   subscribes to that service and then we purchase books directly

12   from the publisher and sell those through our own channels,

13   online or at conferences, and those numbers are a combination

14   of BookScan and the numbers printed and purchased by us

15   directly from the publisher.

16   Q.    So you believe those numbers are reasonably accurate?

17   A.    I believe those numbers are close, yes.

18   Q.    Okay.  For let's just say 2016, what was Cy Wakeman,

19   Incorporated's annual gross income?

20   A.    I would need to check our files.

21   Q.    Can you estimate?

22   A.    I would need to check our files.

23   Q.    More than a million?

24   A.    Did you say gross?

25   Q.    Yes.

1    A.    Yes.

2    Q.    Okay.  More than a million-and-a-half?

3    A.    I would have to check.

4    Q.    Okay.  So probably somewhere between a million and a

5    million-and-a-half; is that fair?

6              MR. VINT:  Objection.  Misstates the record.

7              THE COURT:  Overruled.  He's just asking the

8    question.

9    A.    Yeah, I would have to check.

10   BY MR. HIGH:

11   Q.    Okay.  Is it your belief that it -- the -- Cy Wakeman,

12   Incorporated's annual gross income is probably more than a

13   million but probably less than a million-and-a-half for 2016?

14   A.    Again, I would have to check.

15   Q.    Do you have any idea what Cy Wakeman, Incorporated's

16   annual net income was for 2016?

17   A.    I don't.

18   Q.    Less than a million?

19   A.    There's so many ways to define that income.  I would -- I

20   would have to check the income statement.

21   Q.    Okay.  Would you agree that that income can be easily

22   defined or readily definable?  If you looked at the books,

23   you'd be able to figure out what it is?

24   A.    Yeah, I would be able to check.

25   Q.    And if you know, if you have an opinion, what'd you think

1   Cy Wakeman, Incorporated is worth today?

2   A.   I haven't had an evaluation done.

3   Q.   Okay.  But you could have an evaluation done, correct?

4   A.   I could.

5   Q.   You could have more than one evaluation done, correct?

6   A.   Yes.

7   Q.   And that would give you a reasonable estimate of what your

8   business is worth today?

9   A.   Yes.

10  Q.   When you hired Nicole Price, was she a corporate officer?

11  A.   She was an officer.

12  Q.   Was she an officer of the corporation?

13  A.   No.

14  Q.   Cy Wakeman -- was she an officer of the corporation Cy

15  Wakeman, Incorporated?

16  A.   No.

17  Q.   Okay.  Did Cy Wakeman, Incorporated ever have any board

18  meetings?

19  A.   Yes, we have board meetings.

20  Q.   Was Nicole Price made aware of those board meetings?

21  A.   I'm not sure if she was made aware but -- no.

22  Q.   Did Nicole Price attend --

23  A.   She did not attend.

24          THE COURT:  Just a moment.  Ask the question, then

25  answer the question, okay?  So don't talk over each other.

 1                THE WITNESS:  Okay.

 2                THE COURT:  You may proceed.

 3     BY MR. HIGH:

 4     Q.   Was Nicole Price ever -- did -- I'm sorry, did Nicole

 5     Price ever attend any of the Cy Wakeman board meetings for the

 6     corporation?

 7     A.   No.

 8     Q.   You previously testified that around the time you hired

 9     Nicole diversity was not on your radar; is that right?

10     A.   Yes.

11     Q.   It was not something --

12     A.   As an offering.

13     Q.   It wasn't something that Wakeman, Incorporated was doing?

14     A.   Yes, we did -- we did not have anything other than my

15     commentary and my philosophy that I offered on diversity.  We

16     did not have a formal program.

17     Q.   And you previously testified that you supervised the

18     creation of the reality-based inclusion program?

19     A.   Yes.

20     Q.   What specifically did you do to supervise the creation of

21     the reality-based inclusion program?

22     A.   I initiated the project.  I asked for outline review.  I

23     talked with Nicole and David Delgado on the progress of the

24     creation of that.  I reviewed the slides.  I reviewed the

25     submission to SHERM, the description of the talk that we'd be

 1    giving.  I offered through email key points that I wanted to

 2    ensure was included and I had discussions with Nicole about a

 3    diversity philosophy that aligns with reality-based leadership.

 4    Q.    Okay.  Were most of those discussions via email?

 5    A.    No.  I would say most of those discussions were in team

 6    meetings and that a few of those directives were made via

 7    email.

 8    Q.    If you recall, on what date did you terminate Price?

 9    A.    I don't recall the date.  I know it was in August.

10    Q.    If I indicate that the record reflects August 21st, is

11    that correct?  Do you have any reason to disagree with that?

12    A.    I don't have any reason to disagree with the record.

13    Q.    And how long before August 21st did you learn that Price

14    had intended to start a competing business?

15    A.    I learned in May that she had potentially began a

16    competing business.

17    Q.    How did you learn in May that she potentially began a

18    competing business?

19    A.    I had two people contact me and share their opinions.

20    Q.    Who were those people?

21    A.    Her husband was one of those and a client that's under NDA

22    that was another.

23            THE COURT:  A client what?  I didn't hear.

24            THE WITNESS:  A client that we have a nondisclosure

25    agreement with.

Wakeman - Cross                                                          29

1          THE COURT:  Thank you.

2    BY MR. HIGH:

3    Q.   If you knew in May that she was going to start a competing

4    business, why did you wait till August to fire her?

5    A.   I talked with her immediately, within at least 48 hours,

6    of her intentions and she denied that she had filed any

7    business paperwork, that she -- she denied every issue that I

8    brought up.

9    Q.   So then what specific incident made you decide to fire

10   her?

11   A.   I accidentally received meaning she didn't intend to copy

12   me on an email that included many other people on it that

13   shared her plan to ask me to become an independent contractor

14   in 2017, and it indicated that she was going to work in a

15   competing business and get that business set up while working

16   for me.

17        And I again asked her if that was true and when she

18   admitted some of the things that were happening, I terminated

19   her.

20   Q.   Okay.  When did you receive that email?

21   A.   I would have to check, but it was probably within a week

22   of me firing her.

23   Q.   Okay.  So you had received that email before you proposed

24   that she sign a noncompete agreement?

25   A.   I would have to check.

1    Q.    Do you deny that you asked her to sign a noncompete

2    agreement on August 20th, the day before you terminated her?

3    A.    I asked her and my entire team to sign a new noncompete

4    since we had three new hires and the legal work of that

5    noncompete was done before my receipt of the email.

6    Q.    Okay.  So you had a previous noncompete in place?

7    A.    I had a simple noncompete in place, yes.

8    Q.    So you testified that you have changed part of your --

9    what we'll call the third book, *No Ego*?

10   A.    Yes.

11   Q.    In response to a question or a concern raised by your

12   publisher?

13   A.    I changed it in response to my letting my publisher know

14   that there's an infringement on my copyright, and they asked

15   for me to consider leaving that out of the book, and that's a

16   decision we made.

17   Q.    Okay.  But you're still selling the third book *No Ego*?

18   A.    Yes.

19   Q.    Okay.  And it's going to go on sale in two months, right?

20   A.    Yes.  It's a shorter version.

21   Q.    How much shorter?

22   A.    I would have to check for type when they lay it out in

23   type but at least two chapters.

24   Q.    And how many chapters are in the book?

25   A.    I would need to check.  I believe 11.

Wakeman - Cross                                                    31

1    Q.    Did you approach Ms. Price and discuss the potential issue

2    of copyright and perhaps ask her for a waiver before you

3    changed your third book *No Ego*?

4    A.    No.  I did not.

5    Q.    Why?

6    A.    Because I don't believe that she has a copyright to waive.

7    I believe that I'm in litigation to ensure that the copyright

8    of my material is clean before I would invest in publishing.

9    So without a copyright, she would have no waiver to sign to me.

10   Q.    You previously testified that Nicole shared confidential

11   information outside of Cy Wakeman?

12   A.    Yes.

13   Q.    What did she share?

14   A.    She shared financials.  She shared our template for

15   contracting.  She shared a coaching toolkit and -- with the

16   email on our server, there are other things she shared.

17   Q.    Okay.  So she was emailing these documents to other

18   people?

19   A.    Yes.

20   Q.    And she was saving the emails to your own server?

21   A.    She was emailing during work hours from my business email.

22   Q.    Cy Wakeman had a copy of the emails?

23   A.    We have email addresses for all of our employees at

24   cywakeman.com and any email any of us send -- we're an HR

25   organization -- is -- any of us are in it -- on anyone's email

1    it's general practice and we have copies of all email, yes.

2    Q.    So had you wanted to look at any email Nicole Price sent,

3    you could have looked at all those emails, correct, from her --

4    A.    Yes.

5    Q.    -- from her Cy Wakeman email address?

6    A.    Yes.

7    Q.    Okay.  In the -- in the months before you terminated

8    Nicole Price, did she come to you and discuss her workload?

9    A.    I arranged a meeting with her to discuss her performance.

10   Q.    Why did you do that?

11   A.    Because her performance had declined two years

12   consecutively and was not living up to her original agreement

13   with the organization.

14   Q.    At any time before you terminated Nicole Price, did she

15   discuss with you her workload?

16   A.    Yes.

17   Q.    Did she discuss with you the dissatisfaction with her

18   workload?

19   A.    Yes.

20   Q.    What did she say?

21   A.    She was under the belief that her workload had increased

22   300 percent, and as I revisited our original agreement, that in

23   order to fulfill it, she would be doing three presentations a

24   week and be doing other projects from her home office two days

25   a week.

1   Q.   I'm sorry, I didn't hear you.  You said in order to what?

2   A.   Fulfill the agreements that we had and had lived by for

3   three years.  I consistently showed numbers of what each of our

4   speakers produce and what we needed from her from a performance

5   standpoint.

6   Q.   On or about what date did that conversation take place?

7   A.   There were multiple days.

8   Q.   On or about what dates did those conversations take place?

9   A.   I'm unsure.  I would say potentially starting in February

10  and I think in April.

11  Q.   Of 2016?

12  A.   Uh-huh.

13          THE COURT:  You have to say yes or no.

14          THE WITNESS:  Pardon?

15          THE COURT:  You have to say yes or no.

16          THE WITNESS:  Oh, yes.

17          THE COURT:  Thank you.

18  BY MR. HIGH:

19  Q.   So is this -- tell me if this is correct.  The

20  conversations that you had with Nicole Price about her

21  dissatisfaction with her workload took place in 2016?

22  A.   Repeat the question.  Tell me if it's correct.

23          COURT REPORTER:  "So is this -- tell me if this is

24  correct.  The conversations that you had with Nicole Price

25  about her dissatisfaction with her workload took place in

Wakeman - Redirect                                                    34

1    2016?"

2    A.    The conversations, yes.

3    BY MR. HIGH:

4    Q.    And there were two or three conversations with Nicole

5    Price about --

6    A.    Yes.  There were multiple conversations of me sharing my

7    concern about her performance and she sharing that her life

8    situation had changed and she would like to work less for the

9    same amount of pay.

10   Q.    Isn't it true that the -- part of the virtual training

11   platform that you have to offer is available for a free

12   download?

13   A.    There are chapters that we do make available for a free

14   download, yes.

15         MR. HIGH:  Okay.  I have nothing further at this

16   time.

17         THE COURT:  Very well.  Any redirect?

18         MR. VINT:  Just a couple, Your Honor.  Thank you.

19                      REDIRECT EXAMINATION

20   BY MR. VINT:

21   Q.    I'll start with the end.  Why do you offer chapters of

22   your virtual training platform for free download?

23   A.    It's like offering a sample.  People like to see what

24   they're buying before they buy it so we show them a sampling

25   and then hopefully they'll have incentive to buy the full

Wakeman - Redirect                                          35

1    course.

2    Q.    You mentioned in your testimony that you had a previous

3    noncompete agreement in place with your employees before the

4    subsequent conversations that led to Ms. Price's termination;

5    is that right?

6    A.    Yes, it was well understood in our company.

7    Q.    Did Ms. Price execute that noncompete agreement when she

8    joined your company?

9    A.    I believe so.

10   Q.    Okay.  And, finally, you testified that you provided your

11   commentary and philosophy on diversity when clients asked prior

12   to the creation of Reality-Based Diversity & Inclusion; is that

13   correct?

14   A.    Yes.

15   Q.    Is that philosophy and that commentary as previously

16   provided summed up within Reality-Based Diversity & Inclusion?

17   A.    Yes.

18   Q.    Thank you.

19          MR. VINT:  Nothing further.

20          THE COURT:  All right.  Very well.  May this witness

21   step down?

22      You may do so.

23      (This concludes the testimony of Cynthia Wakeman.)

24

25

```
 1        I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
 2

 3        /s/Rogene S. Schroder              January 11, 2018
          Rogene S. Schroder, RDR, CRR            Date
 4

 5

 6                           I-N-D-E-X

 7                                    Direct   Cross   Redirect

 8  WITNESSES:
    FOR THE PLAINTIFF:
 9
    Cynthia Wakeman                       2       22       34
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```