```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2

 3   CY WAKEMAN, INC., an Iowa    )    Case No. 8:16CV541
     Corporation, Individually   )
 4   and as Assignee of John     )
     Wiley & Sons, Inc.,         )
 5                               )
               Plaintiff,        )
 6                               )
     vs.                         )
 7                               )
     NICOLE PRICE CONSULTING, LLC )
 8   d/b/a LIVELY PARADOX, a      )
     Missouri limited liability   )
 9   company, and NICOLE D. PRICE, )
                                  )
10                               )    Lincoln, Nebraska
               Defendants.       )    July 7, 2017
11

12            TRANSCRIPT OF TESTIMONY OF NICOLE PRICE
               BEFORE THE HONORABLE JOHN G. GERRARD
13                  UNITED STATES DISTRICT JUDGE

14

15                    A-P-P-E-A-R-A-N-C-E-S

16   FOR THE PLAINTIFF:      Mr. Patrick T. Vint
                             Woods & Aitken LLP
17                           10250 Regency Circle
                             Suite 525
18                           Omaha, NE 68114

19   FOR THE DEFENDANTS:     Mr. Justin W. High
                             High & Younes
20                           6919 Dodge Street
                             Omaha, NE 68132
21
     COURT REPORTER:         Ms. Rogene S. Schroder, RDR, CRR
22                           111 South 18th Plaza
                             Suite 3129
23                           Omaha, NE 68102
                             (402) 661-7383
24

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer.
```

 1              MR. HIGH:  Yes, Your Honor.  I'd call Nicole Price to

 2     the stand.

 3              THE COURT:  Miss Price, if you'd step forward.

 4         Take a seat at the stand, please.

 5         Adjust the microphone and we'll have you sworn in.

 6              COURTROOM DEPUTY:  Ma'am, please state and spell your

 7     name for the record.

 8              THE WITNESS:  Nicole D. Price.  N-i-c-o-l-e, D,

 9     P-r-i-c-e.

10              COURTROOM DEPUTY:  Please raise your right hand.

11              NICOLE D. PRICE, DEFENDANT'S WITNESS, SWORN

12              THE COURT:  Very well.  You may inquire.

13                         DIRECT EXAMINATION

14     BY MR. HIGH:

15     Q.   Ms. Price, what is your present residential address?

16     A.   4110 Northwest 75th Street.

17     Q.   In what city?

18     A.   Kansas City, Missouri 64151.

19     Q.   Where were you born?

20     A.   Kansas City, Missouri.

21     Q.   How old are you today?

22     A.   Forty years old.

23     Q.   Will you tell the Court a little bit about your

24     educational background, please.

25     A.   I have a bachelor's degree in chemical engineering from

1   North Carolina Agricultural and Technical State University in

2   Greensboro, North Carolina; I have a master's in adult

3   education from Park University in Parkville, Missouri; and I'm

4   currently pursuing my doctorate degree in adult leadership and

5   management, and that's from Capella University in Minneapolis,

6   Minnesota.

7   Q.   Did you ever work for Hallmark, Incorporated?

8   A.   Yes.

9   Q.   When did you work for Hallmark, Incorporated?

10  A.   I started Hallmark Cards in 1998 as a --

11         THE COURT:  I'm sorry, I didn't get --

12         MR. VINT:  I apologize.

13         THE COURT:  You got buzzed up there.  When?

14  A.   In 1998, June 8th, 1998, as a chemical engineer and I

15  worked there until August -- I'm sorry, October 31st, 2012.

16  BY MR. HIGH:

17  Q.   You started as a chemical engineer?

18  A.   That's correct.

19  Q.   Did your job duties change at any time during your

20  employment with Hallmark?

21  A.   Yes.

22  Q.   What was your ending job title?

23  A.   I was in charge of learning and development.

24  Q.   Can you tell the Court what that means.

25  A.   So my role was to evaluate leadership programs and

1    identify based on the different divisions what leadership

2    training was necessary across the enterprise.

3         So Hallmark had retail, distribution, manufacturing,

4    corporate offices, and so the leadership competencies in those

5    different divisions would be different, especially for the

6    creative organization.

7         And so my job was to figure out based on competencies

8    which leadership training would be relevant for the leaders in

9    those specific divisions.

10   Q.   At any point during your employment with Hallmark, did you

11   make the decision to write a book?

12   A.   Yes.

13   Q.   Can you tell the Court about that, please.

14   A.   So in the capacity of President of the Hallmark

15   African-American Leadership Council, it's an employee resource

16   group or an affinity group, George C. Fraser, the President and

17   owner of FraserNet, came to be a keynote speaker that year in

18   2010 for Black History Month, and one of the things that he --

19   was talked about in his speech was starting a book, and I

20   started a -- a new book file that year.

21   Q.   Did that new book file eventually become a finished,

22   published work?

23   A.   Portions of it, yes.

24   Q.   What was that finished, published work called?

25   A.   *Lively Paradox*.

Price - Direct                                                    5

1   Q.   So correct me if I'm -- you started *Lively Paradox* while

2   you were still an employee of Hallmark?

3   A.   That's correct.

4   Q.   At some point during your time at Hallmark, did you meet

5   Cy Wakeman?

6   A.   Yes.

7   Q.   How did you come to meet Cy Wakeman?

8   A.   In 2011 we had just spent $6 million on the Woodstone

9   Principle program, and I was having trouble from a performance

10  standpoint because we weren't seeing a return on investment for

11  that $6 million, and Mary Beth Ebmeyer came to me in the fall

12  of 2011 and suggested that I review the reality-based

13  leadership program by Cy Wakeman.

14       And Cy Wakeman was going to be in Kansas City delivering

15  content, I don't remember for which organization, and so I

16  attended that session and decided that her content would be

17  good for the leaders -- the mid-level leaders in -- in

18  corporate for Hallmark Cards.

19            THE COURT:  And who is Mary Beth Edenmeyer

20  (phonetic)?

21            THE WITNESS:  So Mary Beth Ebmeyer is the person who

22  hired me into the role of learning development.  She's also the

23  person I give credit for helping me transition from a technical

24  career to a learning and development career and she's also the

25  person who helped me create some of the *Lively Paradox* content

1    called the effectiveness drain.

2    BY MR. HIGH:

3    Q.   At any point in time, were you hired by Cy Wakeman,

4    Incorporated?

5    A.   Yes.

6    Q.   To your knowledge, why did Cy Wakeman, Incorporated hire

7    you specifically?

8    A.   So as I was working as a learning and development

9    professional for Hallmark Cards, part of what I reached out to

10   Cy Wakeman to do in 2012 when she came into our organization --

11   at the time her training materials included a black-and-white

12   stapled handout, maybe about 20 pages.

13        Hallmark Cards is a very aesthetically judgmental

14   organization because of the number of creatives who work there,

15   and so I asked Cy Wakeman could I create some training

16   electronically based on her content for Hallmark Cards

17   specifically and she said yes.

18        So in that capacity I created I guess material that you

19   could scale.  Because the other challenge I had was I had 600

20   middle managers in that corporate office, and Cy Wakeman at the

21   time didn't have capacity to help support just us, and so this

22   virtual option -- we didn't call it virtual training, it was

23   just online -- was a way for us to fill the gaps.

24        And so when my role was changing back to a more technical

25   role inside of human resources, I mentioned that to Cy Wakeman,

Price - Direct                                                    7

1    and at the time she said that she had just had someone turn her

2    down for her Vice President of Training role, and so the timing

3    was perfect for us to work together, and my understanding was

4    that I was to create training materials based off of her

5    existing content to help spread her message even further.

6    Q.   You'll have to forgive me.  I've never worked for a large

7    corporation.  You say scale.  You just mean number of

8    documents?

9    A.   So think of it this way.  If -- if I need to make one

10   hamburger, no problem.  If I need to be McDonald's, problem.

11   Q.   Right.

12   A.   And so when you think how do I train a few people, it's

13   fairly easy to do with a speaker coming in to do so.  But when

14   you need to train hundreds of people in lots of different

15   locations, you need a specific training model.  So it's

16   operationalizing a program so that it's consistent across the

17   enterprise.

18        So I want to know if my creative managers then switch to

19   retail that they all got the same leadership program.  So

20   that's what scale means.

21   Q.   Is it your belief that Wakeman, Incorporated hired you to

22   fill a gap in their offering?

23   A.   Yes.

24   Q.   How would you describe that gap?

25   A.   It was specifically around training materials.  So I

Price - Direct                                                      8

1    helped to create workbooks for participants in our classes.  So

2    if a client is paying thousands of dollars for a speaker to

3    come in in general, this is opinion, based on my experience as

4    a learning and development professional, I expect that my

5    speaker who I'm paying thousands of dollars for would have

6    workbooks.  It's -- it's very common that workbooks are part of

7    the materials for the participants.

8          The other model that I brought to Wakeman was called

9    the -- the Train the Trainer model.  So she was familiar with

10   the model.

11         I'm sorry, I'm distracted.

12   Q.   That's okay.  At some point --

13   A.   Can you repeat that question so I can answer it?  I -- I

14   was hearing other things.

15              THE COURT:  Okay.  What are you hearing?  I was

16   writing so...

17              THE WITNESS:  Oh, no, I was hearing talking.

18              THE COURT:  Oh, all right.  You may rephrase the

19   question.

20   BY MR. HIGH:

21   Q.   Let's --  I think you answered the question.  Let's move

22   on.  At some point with your -- in your employment with Cy

23   Wakeman --

24              THE COURT:  I'm not sure she did.  She was talking

25   about training the trainer and I'm not sure that I heard -- or

1    did you finish that?

2              THE WITNESS:  I think I had more to say, but now I --

3    I started to get background noise so I...

4              THE COURT:  I'm allowing you to tell me what you want

5    to tell me.

6              THE WITNESS:  Okay.  Can we repeat the question for

7    me so I can remember where I was?

8              COURT REPORTER:  "How would you describe that gap?"

9    A.   Oh, okay.

10        So in addition to handouts for materials in the classroom,

11   there was a Train the Trainer.  So the idea is that if I have a

12   small enough outfit and I can't afford to bring a speaker in, I

13   can buy an off-the-shelf model, and I can train my people

14   myself.

15        And so that project was incomplete, and I finished that

16   project for Cy Wakeman, and I think the price point of that

17   item is about $300 on Amazon.  And any person across the world

18   can buy it and teach their -- teach the concept so that's in

19   line with the scaling.

20        And then I suggested a certification program.  So for

21   organizations that were like Hallmark Cards that were too large

22   for a five-person organization to support, they could then send

23   people to learn the content, pay for a licensure fee and then

24   they could deliver that content inside their organizations.

25             And so I created the workbook, the Train the Trainer and

1    the certification programs for both *Reality-Based Leadership*

2    and *Reality-Based Rules of the Workplace*.

3        And then two years -- the actual year was 2014, virtual

4    training was created for Cy Wakeman, Inc. for *Reality-Based*

5    *Leadership* first and then for *Reality-Based Rules of the*

6    *Workplace* second, and based on the content in the books and

7    some back-and-forth, the virtual training was -- documents were

8    created and that was my -- my role.

9    BY MR. HIGH:

10   Q.   Ms. Price, at the time Wakeman, Incorporated hired you,

11   did they have any employees that specialized in diversity and

12   inclusion?

13   A.   No.

14   Q.   Is it your belief that you were hired to add that facet to

15   Wakeman's offering?

16   A.   No.

17   Q.   At some point in your employment with Wakeman,

18   Incorporated, did you become dissatisfied?

19   A.   Yes.

20   Q.   Why?

21   A.   So the first year that I worked for Cy Wakeman, Inc., I

22   did 35 speaking engagements, the second year around 73 speaking

23   engagements, the third year less than 60 but more than 50.

24       In my mind, because I had created the certification

25   program which brought in $5,000 per participant and for the

1    course of that year more than a quarter of a million dollars,

2    in my mind my personal work-life balance was being offset by

3    the amount of revenue that was generated.

4         So in my engineering background, it was never related to

5    number of projects.  It was always related to revenue

6    generation and so my revenue generation went up each year, not

7    down.

8         And so in 2015 I was asked to increase my speaking

9    engagements to 150 speaking engagements a year and I was told

10   that that was what I signed up for when I signed on to work.

11        However, I take care of my only son mostly by myself and

12   being away from my child for 150 speaking engagements a year,

13   considering the fact that you need to travel to speaking

14   engagements the night before, would mean that I'd be on the

15   road over 250 days a year and that was not okay for me,

16   especially considering that it was my son's final year in high

17   school.

18        And I was looking at the revenue numbers, and so I told Cy

19   Wakeman that what I was -- what I was more interested in was

20   closer to somewhere between 20 and 30 speaking engagements a

21   year, again, because of the revenue that was generated from the

22   other offerings that I had pretty much solely created.

23   Q.   So you discussed with Cy Wakeman changing your dynamic

24   with the company?

25   A.   Yes.

1    Q.    What did you propose specifically?

2    A.    So at the same time I learned that the other speaker, Lisa

3    Gunderson, was under a contract whereby she received 60 percent

4    of her speaking fee and shared 40 percent of her speaking fee

5    with the organization.  And if I had that same contract, I

6    would have made twice as much money so I would have gone from

7    $120,000 a year to $240,000 a year.

8          And so in my mind, okay, as a contractor, I would be paid

9    for only what I did, I'd be responsible for my own taxes, my

10   own insurance and my own benefits and, therefore, my personal

11   need to adjust my schedule wouldn't impact the business

12   unfairly.

13         I also at the same time was looking at the revenue

14   generation from the virtual training, and Cy Wakeman and I had

15   also had a specific conversation in which she shared with me

16   that it was never her intent to transfer her speaking schedule

17   onto -- onto me, that we were trying to "make money" while we

18   sleep which was what certifications and virtual trainings would

19   do for us.

20   Q.    Did you discuss with Ms. Wakeman the possibility of

21   becoming an independent contractor at any point in time?

22   A.    Yes.

23   Q.    When did that discussion take place?

24   A.    It was early 2016.

25   Q.    Did you have multiple conversations about that?

1    A.    Yes.

2    Q.    And you filed -- I'm sorry, you directed that an LLC be

3    filed on your behalf?

4    A.    I'm sorry?

5    Q.    You created an LLC?

6    A.    I did create an LLC, yes.

7    Q.    It was a public filing?

8    A.    Yes.

9    Q.    Did you conceal that from anybody?

10   A.    I didn't conceal it.  I didn't share it either.

11   Q.    Okay.  And you discussed with Ms. Wakeman the possibility

12   of you publishing a book?

13   A.    Yes.  So when we talked about the client, Great Western

14   Bank, who was interested in diversity and inclusion training,

15   one of the things that Cy Wakeman offered to do for me was to

16   co-author my book, and at the time she said it would be Nicole

17   Price with Cy Wakeman, and she stated that her position as a

18   *New York Times* best-selling author would help me to launch my

19   business and help to launch the book.

20   Q.    Help you to launch your business?

21   A.    Yes.  My speaking business, yes.

22   Q.    Is that specifically what she said?

23   A.    Yes.  Ultimately, the goal was that eventually I would

24   have a speaking business per her suggestion.

25   Q.    Are you familiar with the author Byron Katie?

Price - Direct                                                          14

1    A.    I am.

2    Q.    For your book *Lively Paradox*, did you utilize any concepts

3    that were created by Byron Katie?

4    A.    Yes.

5    Q.    Would you tell the Court about that, please.

6              THE COURT:  How do you spell the last name?

7              MR. HIGH:  K-a-t-i-e.

8              THE COURT:  Thank you.

9        You may answer the question.

10   A.    Specifically, the content around suffering is optional.

11   Byron Katie suggests that whenever we're suffering it's because

12   we believe our thoughts about an item and not necessarily the

13   item or the circumstances themselves.  The idea and the concept

14   is not unique to her.

15       The Buddhists believe the same thing; however, Byron Katie

16   is -- she's been on *Oprah* and has a large organization, The

17   Work International, where she shares workshops to help people

18   stop their suffering.

19   BY MR. HIGH:

20   Q.    You also used and credited other professionals with -- I'm

21   sorry, at the back of your book in sources for the concepts

22   that you utilized in *Lively Paradox*?

23   A.    That's correct.

24   Q.    So you -- you acknowledge these aren't new concepts?

25   A.    That's correct.

1    Q.    These concepts predate *Lively Paradox*?

2    A.    That's correct.

3    Q.    They predate any of the work you did with Cy Wakeman.

4    A.    That's correct.

5    Q.    They predate your employment with Hallmark.

6    A.    That's correct.

7    Q.    In terms of the specific allegations of infringement in

8    Ms. Wakeman's complaint, have you had an opportunity to review

9    what she's specifically saying you're infringing upon?

10   A.    Yes.

11   Q.    I want to talk to you briefly about the table in *Lively*

12   *Paradox*.  If you know what I'm talking about, that came from an

13   author named Arin --

14   A.    Dr. Arin Reeves.

15   Q.    Right.  The table in *Lively Paradox*, when did you create

16   that?

17   A.    So I -- when I was the Chair of -- or Chair and President

18   of the Hallmark African-American Leadership Council, Arin

19   Reeves came in as a part of the Diversity and Inclusion Council

20   to teach us more about stereotype threat, subconscious biases,

21   and one of the exercises that she did at Hallmark Cards was

22   presented in that table in longer form.

23   Q.    So this table specifically on page 17 of Exhibit 34, when

24   did you originally create this?

25   A.    The content in it?

1    Q.    Yeah, the table.

2    A.    Yeah.  So it would have been circa 2007, 2008.

3    Q.    While you were at Hallmark?

4    A.    While I was at Hallmark.  So some of the -- so Dr. Arin

5    Reeves' table is longer.  My purpose for removing race, my

6    purpose for removing sexual orienta- -- veteran status was

7    because some of those things at the time -- Hallmark was

8    thinking we were beyond race and gender, and so to talk about

9    diversity and inclusion from a spirit of race would have just

10   caused more dissension, and so I culled out the things in

11   Dr. Arin Reeves' list that would have caused people to bristle

12   at the content, and so we used the things that were a little

13   less problematic like child and parent, LGBTQ and straight so I

14   culled down Arin's list to a shorter list.

15   Q.    In terms of the allegations of infringement made by Cy

16   Wakeman, is it your belief that the concepts and work done and

17   used in that material predated the material itself?

18   A.    Predated the reality-based inclusion material or...

19   Q.    Yes.

20   A.    Yes.

21   Q.    Okay.  Can you explain that to the Court, please.

22   A.    Yes.  So when Great Western Bank requested a diversity and

23   inclusion program, my problem specifically with that client is

24   that if I had to guess, the percentage of minority employees

25   they have, I'd say it's about 1 to 2 percent.

1          And so virtually I would be the African-American woman

2     coming into Iowa, a state that is 99 percent white, teaching

3     them about how to be more inclusive.

4          From my experience in the area of diversity and inclusion,

5     it is much better, much more sustainable to use a person who

6     fits the -- fits the criteria of a group to teach them

7     something.  So, for example, if I'm going into a white male

8     environment trying to teach them about diversity and inclusion,

9     it's much more accepted to send a white male.

10         And so my frustration with working with Great Western Bank

11    was I did not want to be pigeonholed into the black person in

12    Iowa teaching this content.

13         And so what I did was -- upon cajoling from Cy Wakeman, I

14    took my history and experience from growing up in Kansas City,

15    Missouri, as a technical professional in urban Kansas City and

16    all of my diversity and inclusion experiences over my life,

17    combined with the research that I'd done as part of my master's

18    program, also as a result of my role as an advisor for the LGBT

19    community at Hallmark Cards, for the Hispanic community at

20    Hallmark Cards, for the Asian community at Hallmark Cards and

21    for the millennial group at Hallmark Cards and in the capacity

22    as the President of the Hallmark African-American Leadership

23    Council, and I married those diversity and inclusion content

24    which was already in my life, part of my book, with Cy

25    Wakeman's leadership content.

1        And so for this specific client who was asking for

2    diversity and inclusion work, they also had leadership needs,

3    and so I took Cy Wakeman's content and married it to my content

4    and delivered solely, without any oversight from anyone else,

5    the reality-based inclusion content to Great Western Bank, six

6    sessions, starting in August of 2015.

7    Q.   Did the concept learned helplessness and personal

8    accountability come from C. H. Turner?

9    A.   Yes.  1910.

10   Q.   If you could briefly explain to the Court where those

11   concepts come from and how you became aware of them.

12   A.   Yes.  So my first awareness of C. H. Turner's work came

13   from a show when I was a preteen called *A Different World*.  The

14   fictional character on that show, his name was Dwayne Wade or

15   Dwayne -- yeah, Dwayne Wayne, excuse me, Dwayne Wayne, and

16   Dwayne Wayne was a teacher in a school, and he talked about the

17   idea that if you put fleas in a glass, they'll all jump out,

18   but if you put fleas in a glass and you put a lid on that

19   glass, the fleas will jump up and hit their bodies against that

20   lid until it hurts, and then just when the fleas start jumping

21   just below the glass, you can take the lid off and the fleas

22   will never jump out of the glass, and the reason is because

23   they've learned to be helpless, and so that was my initial

24   introduction to the concept of learned helplessness.

25        If you fast-forward 20 years, when I was working with Cy

1    Wakeman, she talked about learned helplessness from the -- the

2    concept of an elephant, and it's documented in the book

3    *Reality-Based Leadership*.

4        When an elephant calf has been tied to a tree or some

5    immovable object, you can -- they will try really hard in the

6    first few weeks of their lives to get away, but then just at

7    the time they become big enough to break the chains, they won't

8    do so, and why it's still learned helplessness, they believe in

9    their minds that they can't.

10       Well, there were several clients, several meaning more

11   than three, who wrote to us via our website complaining that

12   the circus industry is cruel to elephants and we are

13   perpetuating this cruelty by telling the story.

14       So while I disagreed, I knew that most people don't really

15   care that much about fleas so I started telling the flea story

16   instead of the elephant story.

17       And then when I got ready to -- many people associate that

18   work with Martin Seligman in 1970, including Cy Wakeman in her

19   book *Reality-Based Leadership;* however, as part of my studies

20   of my master's program, I -- I found that the original work was

21   done by C. H. Turner in 1910 on the evidence -- the behavior of

22   ants -- ants and insects other than spiders.

23       And anyone can watch a video of the learned helplessness

24   on -- there's several YouTube videos.  It shows it with dogs.

25   Please don't do the exercise with dogs.  People really love

1    dogs.  Elephants, fleas, lots of insects.

2    Q.    Learned helplessness is not your idea?

3    A.    No.

4    Q.    Learned helplessness is not Cy Wakeman's idea?

5    A.    No.

6    Q.    The concepts of judgment and natural state.  It's not your

7    idea?

8    A.    No.

9    Q.    It's not Cy Wakeman's idea?

10    A.    No.

11    Q.    Whose idea is it?

12    A.    I'd venture to say that it's a Christian principle.  It's

13    also a Buddhist principle.  It is covered in the Koran in

14    Islam, but Byron Katie is the person whose popularized it in --

15    in today's times, I would say.

16    Q.    Wakeman has alleged that you plagiarized a story about her

17    going to a retreat from Southern California.

18    A.    Yes.

19    Q.    Did you go to the same retreat?

20    A.    I did.

21    Q.    Did the retreat have exercises?

22    A.    Yes.

23    Q.    Does every member of the retreat do the same exercises?

24    A.    Every member of the retreat I was in did the same

25    exercises, yes.

Price - Direct                                                21

1    Q.    To your knowledge, is that part of a program that is given

2    repeatedly to members -- or, I'm sorry, patrons of the retreat?

3    A.    Yes.

4    Q.    Is it your belief you did the same exercises as Cy

5    Wakeman?

6    A.    Yes.

7    Q.    Did you put that in your book because she put it in her --

8    because she put it in her book?

9    A.    No, I didn't even recall that it was in her book.

10   Q.    Did you create the concept of wholeheartedness is the

11   antidote to fatigue?

12   A.    I did not.

13   Q.    Did Cy Wakeman create that concept?

14   A.    She did not.

15   Q.    Who created it?

16   A.    David White, the poet.

17   Q.    Is it a widely known anecdote and is it commonly used in

18   your industry?

19   A.    Not commonly used in leadership development but absolutely

20   commonly used in psychology.

21   Q.    Is it your position that all of these individual

22   allegations of copyright infringement are much the same as what

23   you've already testified to being a preexisting concept created

24   by somebody else and adapted for your purposes?

25   A.    That's correct.

1   Q.    To your knowledge, did anybody ever approach Cy Wakeman,

2   Incorporated with an issue about copyright?

3   A.    Yes.

4   Q.    Tell the Court about that, please.

5   A.    So there's a man named John G. Miller, he wrote a book

6   called *The Question Behind the Question*, most popularly known

7   as *QBQ*, and John Miller reached out to Cy Wakeman and asked --

8   and this was -- this predated me.  This is per Cy's information

9   to me.  This predated me working for her.

10         And John Miller asked that she start --

11              MR. VINT:  Objection, Your Honor, hearsay.

12              THE COURT:  Overruled for purposes of this hearing.

13         You may continue.

14   A.    Cy Wakeman said that she was adding John -- we needed to

15   put John G. Miller's information in the PowerPoint deck because

16   he had an issue with copyright, said the content was his.

17              THE COURT:  That was Cy Wakeman's statement?

18              THE WITNESS:  Yes.

19              THE COURT:  All right.  The objection is overruled.

20   BY MR. HIGH:

21   Q.    So to your knowledge, somebody has complained about Cy

22   Wakeman, Incorporated infringing upon their copyrights?

23   A.    Yes.

24   Q.    And what was done in response?

25   A.    She added John G. Miller's name to the specific slides

Price - Direct                                                       23

 1    where -- when we were speaking about *The Question Behind the*

 2    *Question*.

 3    Q.    Did you ever bring up potential infringement of Wakeman,

 4    Incorporated material with Ms. Wakeman?

 5    A.    Yes.

 6    Q.    Tell the Court about that, please.

 7    A.    So there was several times, more than three, where clients

 8    or people would ask about Byron Katie in particular.  There's

 9    a -- a competency attributed to reality-based leadership called

10    reality-based thinking, and in the reality-based thinking

11    competency, there's a process called the thought cycle.

12         The thought cycle in itself was very similar to the work

13    of Joseph Grenny in the book *Crucial Conversations* and so

14    someone brought that to my attention.  And then also the Edit

15    Your Story exercise is very closely related to the work -- or

16    Judge-Your-Neighbor Worksheet by Byron Katie, and so what I

17    started to do when I was speaking would just share -- and this

18    was pretty consistent.

19         I -- I can't give you a number for how many times I've

20    listened to audio recordings of Cy Wakeman earlier in her

21    career and earlier in her career she used to say Byron Katie's

22    name.  She used to say *Crucial Conversations*.  She would say

23    Peter Block.  She would say Peter Block is *Flawless Consulting*

24    or she would say John Kotter and -- and change.

25         But as time progressed, those peoples' names would fall

1    off.  And so for me working in academia, I would just say if

2    you want to learn more about happiness in the workplace, you

3    can get the data from Shawn Anchor [*sic*].  Well, I was

4    reprimanded for doing so on a -- a webinar for a Red Hat -- the

5    Hope Source organization.  So Cy Wakeman reprimanded me for --

6    for talking about other people's work even though the work was

7    founded by Shawn Anchor.

8    BY MR. HIGH:

9    Q.    How many copies of *Lively Paradox* have you sold?

10   A.    Less than 200.

11   Q.    What's the unit price?

12   A.    11.95.

13   Q.    There was an issue of a certification.  Is it your

14   understanding that Wakeman, Incorporated has alleged that you

15   are misusing a term in adding that you've been certified in

16   something that you haven't been certified in?

17   A.    Yes, I am aware.

18   Q.    Do you take issue with that?

19   A.    I do.

20   Q.    Why?

21   A.    So the entire certification program, I wrote the content

22   based off of her book.  I am the one who took adult learning

23   principles and presented the content in a way that most adults

24   learn.  I am the one who created the -- the questions, the --

25   the participant workbook as well as the facilitator workbook.

```
1          I'm also the person who taught every single one of the
2     certification programs while I was working for Cy Wakeman.  No
3     one else taught those programs.  In fact, there were times when
4     I certified Cy Wakeman clients in her content and she wasn't
5     there.  And so to then say that I'm not certified -- I'm not
6     certified when I certified at least 100 people each year is
7     problematic to me.
8     Q.   Did you remove some references to Cy Wakeman and Wakeman
9     clients from your LinkedIn page?
10    A.   I did.
11    Q.   Did you remove references to Wakeman or Wakeman clients
12    from your web page?
13    A.   I never had Wakeman clients on my web page, but I did
14    remove Wakeman clients from my LinkedIn page.
15    Q.   Would you be willing to make further alterations to your
16    LinkedIn page or a web page if Wakeman, Incorporated requested
17    that you do so?
18    A.   Reasonable requests, yes.
19              MR. HIGH:  Nothing further at this time, Your Honor.
20              THE COURT:  All right.  Very well.  Cross-exam.
21              MR. VINT:  Thank you, Your Honor.
22         I'll turn my microphone on.
23         Thank you, Your Honor.  May I approach the witness?
24              THE COURT:  You may.
25         Just a moment.  I'm going to ask the court reporter.  If
```

1    the court reporter needs a break, you tell me.

2                  COURT REPORTER:  Soon.

3                  THE COURT:  Okay.  You're okay?

4                  COURT REPORTER:  Mm-hmm.

5                  THE COURT:  All right.

6                  MR. VINT:  I don't expect this to take too long so

7    hopefully we won't...

8                  THE COURT:  I'm going to let her tell us, okay.

9            All right.  Very well.  Cross-exam.

10                  MR. VINT:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. VINT:

13   Q.   Ms. Price, I just handed you a copy of an affidavit that's

14   marked as Exhibit 22 in this matter.  Have you reviewed that

15   affidavit prior to today?

16   A.   Yes.

17   Q.   But I understand from discussions with your attorney

18   before we started today that you actually signed and notarized

19   that affidavit today; is that correct?

20   A.   That's correct.

21   Q.   Did you review it before signing it today?

22   A.   I assumed it was the same.  I trusted my attorney so, no.

23   Q.   I don't believe there's any changes since it was first

24   filed, but -- I'm not implying that, but --

25   A.   Just answering your question accurately.

Price - Cross                                                          27

```
 1    Q.    I understand.

 2    A.    So, no --

 3    Q.    Okay.

 4    A.    -- I did not review it before.

 5    Q.    Would you look at paragraph 9 of that affidavit, please,

 6    ma'am.

 7                THE COURT:  Which paragraph?  Nine?

 8                MR. VINT:  Paragraph 9, Judge.

 9                THE COURT:  Okay.

10    BY MR. VINT:

11    Q.    And I'm just going to read the first two sentences.  "I

12    joined Cy Wakeman, Inc. in November of 2012.  Wakeman wanted to

13    utilize my experience to increase appeal to clients that were

14    interested in increasing diversity and inclusion in the

15    workplace."

16          Did I read that correctly?

17    A.    You did read it correctly.

18    Q.    As I understand it from your testimony today, you are no

19    longer claiming that; is that correct?

20    A.    It's not exactly accurate.

21    Q.    Okay.  I believe your attorney asked you were you brought

22    in to build a diversity and inclusion platform and you said no;

23    is that correct?

24    A.    That's correct.

25    Q.    Ms. Price, isn't it true that on your LinkedIn profile you
```

Price - Cross                                                    28

1    claim that you were, quote, handpicked by Cy Wakeman to develop

2    and deliver training programs based in Cy's reality-based

3    philosophy?

4    A.    That's correct.  Those were her words based on the

5    marketing language she used when she hired me and content that

6    we provided to the 200-plus clients that I spoke to for her.

7    Q.    And that remains on your LinkedIn page today, correct?

8    A.    A point of clarification.  LinkedIn is an online resume

9    so, yes.

10   Q.    Okay.  Is it true that nowhere in your LinkedIn resume you

11   indicate that you were hired or retained by Cy Wakeman, Inc. to

12   provide diversity and inclusion training?

13           MR. HIGH:  Object to the form of the question as

14   to -- I'm sorry, objection, form.  The question does not state

15   a time period.

16           MR. VINT:  Let me rephrase the question, Judge.

17           THE COURT:  All right.  Sustained.  It's sustained as

18   to foundation.

19       You may proceed.

20   BY MR. VINT:

21   Q.    As your -- Ms. Price, as your LinkedIn profile is

22   currently constituted, isn't it true that nowhere in that

23   profile do you indicate that you were hired by Cy Wakeman, Inc.

24   to provide diversity and inclusion training?

25   A.    My LinkedIn profile has been online for years so I can't

1    tell you everything that's on it, but I don't believe so, no.

2    It wouldn't have that on my resume, what I was hired for.  It's

3    not a common practice.

4    Q.    Okay.  Do you claim, as you sit here today, that you

5    created the Reality-Based Diversity & Inclusion presentation?

6    A.    A point of clarification.  So all day today we've been

7    talking about the program presentation and virtual training as

8    the same thing.  They are not.  So --

9    Q.    Ma'am, let me just ask a very simple question.

10   A.    I can't answer your question until you specify which one

11   you're talking about.

12   Q.    Are -- as you sit here --

13   A.    Are you talking about the program --

14          THE COURT:  Just a moment.  Let him ask the question.

15          THE WITNESS:  Okay.

16   BY MR. VINT:

17   Q.    Ms. Price, as you sit here today, are you claiming that

18   you created the PowerPoint presentation entitled Reality-Based

19   Diversity & Inclusion copyrighted by Cy Wakeman in 2015?

20   A.    I created the presentation reality-based inclusion.  I'm

21   not aware of any copyright for that presentation.

22          MR. VINT:  Permission to approach, Your Honor?

23          THE COURT:  You may.

24   BY MR. VINT:

25   Q.    I'm going to show you what's been marked as Exhibit 20 and

1   have you review that.  Ms. Price --

2   A.   Do you have a table or somewhere I can put this?  It's

3   knocking everything over.  Sorry.

4   Q.   You're fine.

5        THE COURT:  There is a table behind if you need it.

6   BY MR. VINT:

7   Q.   Ms. Price, have you reviewed Exhibit 20?

8   A.   I did.

9   Q.   Is Exhibit 20 a copyright for Reality-Based Diversity &

10  Inclusion?

11  A.   It appears to be, yes.

12       MR. VINT:  Okay.  Again permission to approach, Your

13  Honor?

14       THE COURT:  You may.

15  BY MR. VINT:

16  Q.   Ms. Price, I've just handed you a copy of your book *Lively*

17  *Paradox*; is that correct?

18  A.   That's correct.

19  Q.   Would you please turn to page 3.

20  A.   I'm on page 3.

21       THE COURT:  This is Exhibit 34 for the record.

22       MR. VINT:  Yes, Your Honor, thank you.

23       THE COURT:  Okay.

24  BY MR. VINT:

25  Q.   On page 3 of Exhibit 34, Ms. Price, have you copyrighted

Price - Cross                                                           31

1   *Lively Paradox*?

2   A.    I have.

3   Q.    Have you actually registered that copyright with the U.S.

4   Copyright Office?

5   A.    I have.

6   Q.    Okay.  Has a copyright been issued for that?

7   A.    It has.

8   Q.    The --  You mentioned in your testimony the work of Byron

9   Katie; is that correct?

10  A.    That's correct.

11  Q.    And your claim is that Byron Katie's work is included in

12  both Reality-Based Diversity & Inclusion and in *Lively Paradox*;

13  is that correct?

14  A.    Suffering is -- no.  That's not correct.

15  Q.    You're not claiming that Byron Katie's work is included in

16  Reality-Based Diversity & Inclusion and *Lively Paradox*?

17  A.    I'm -- I'm not.

18  Q.    Okay.  Are you claiming that the work of Arin Reeves is

19  included in Reality-Based Diversity & Inclusion or *Lively

20  Paradox*?

21  A.    I am.

22  Q.    All right.  Is it included in *Lively Paradox*?

23  A.    I feel I already answered that question but, yes.

24              THE COURT:  Ma'am, answer the question.  If there's

25  an objection, I'll rule upon it.

1          THE WITNESS:  Okay.

2          THE COURT:  You don't make the objections.

3          THE WITNESS:  Perfect.

4          THE COURT:  Okay.  Very well.

5    BY MR. VINT:

6    Q.   Ms. Price, just to clarify the record, is it your

7    contention that the work of Arin Reeves is included in *Lively*

8    *Paradox*?

9    A.   Yes.

10   Q.   Is it your contention that the inclusion of the work of

11   Arin Reeves -- let me rephrase the question.  Is it your

12   contention that the work of Arin Reeves is included in

13   Reality-Based Diversity & Inclusion?

14   A.   Dr. Arin Reeves' work is in the work of *Reality-Based*

15   *Inclusion*, yes.

16   Q.   Okay.  Did you know that at the time that you published

17   *Lively Paradox*?

18   A.   I did.

19   Q.   Is it your contention that the inclusion of Arin Reeves's

20   work in Reality-Based Diversity & Inclusion has voided the

21   copyright on Reality-Based Diversity & Inclusion?

22   A.   Would you ask that question again.

23   Q.   Yeah.  Is it your contention as you sit here today that

24   the inclusion of the work of Arin Reeves in Reality-Based

25   Diversity & Inclusion would void the copyright issued on

1  Reality-Based Diversity and Inclusion?

2          MR. HIGH:  Objection, foundation.  It calls for a

3  legal conclusion.

4          THE COURT:  Overruled.

5  A.   I'm not familiar enough with copyright law to make that

6  assertion.  What I am asserting is that I can quote Dr. Arin

7  Reeves, who was the original source of that content as I had

8  done in my capacity at Hallmark Cards before, and after

9  employment with Cy Wakeman, and Cy Wakeman Inc.'s decision to

10  not include Dr. Arin Reeves' name on her content, I have no

11  control over that since I don't work there anymore.

12  BY MR. VINT:

13  Q.   Ms. Price, I believe that the -- the issue here is that

14  we're kind of talking past each other.  You talk about author

15  attribution and my question is based in copyright.

16      Once again, is it your contention as you sit here today

17  that the inclusion of Dr. Arin Reeves's work within

18  Reality-Based Diversity & Inclusion voids the copyright on

19  Reality-Based Diversity & Inclusion?

20  A.   I don't know the answer to that.

21  Q.   Do you --  Is it your contention that the work of Arin

22  Reeves being included in *Lively Paradox* voids the copyright on

23  *Lively Paradox*?

24  A.   No, because I got permission from Dr. Arin Reeves to use

25  her work.

Price - Cross                                                        34

 1   Q.   Okay.  Let's just cut to the chase.  Here you mentioned a

 2   number of other persons in the leadership field, the psychology

 3   field, religion and other areas in your testimony today.

 4        Is it your contention that the inclusion of those

 5   materials in Reality-Based Diversity & Inclusion voids the

 6   copyright on Reality-Based Diversity & Inclusion?

 7   A.   I -- I can't speak on someone else's copyright.  I don't

 8   know.

 9   Q.   When you helped to -- well, let me back up a second.  You

10   said that you were responsible or at least partly responsible

11   for putting together the Reality-Based Diversity & Inclusion

12   PowerPoint presentation; is that correct?

13   A.   That's correct.

14   Q.   Did you actually author the material that's included

15   within that presentation?

16   A.   I did.

17   Q.   When you authored that material -- well, let me rephrase

18   it this way.  When you authored that material, were you an

19   employee of Cy Wakeman, Inc.?

20   A.   When I combined my diversity work with Cy Wakeman's

21   leadership work, I was an employee of Cy Wakeman, Inc.

22   Q.   Okay.

23   A.   I did not author that work while working for her.

24   Q.   So your contention is that whatever portions of

25   Reality-Based Diversity & Inclusion came from you were from

1    work you did previous to your employment with Cy Wakeman, Inc.?

2    A.    That's correct.  There was no part of my work with Cy

3    Wakeman that had anything to do with my knowledge of diversity

4    and inclusion.  I work specifically in the capacity of

5    leadership, personal accountability and that's it.

6    Q.    And those concepts are the ones that are included in

7    the -- the Byron Katie, Arin Reeves and other persons that you

8    mentioned before?

9    A.    You're conflating issues.  So Dr. Arin Reeves is a

10   diversity and inclusion expert.  Byron Katie is an expert on

11   questioning your thoughts.  They have nothing to do with each

12   other.

13          MR. VINT:  Would you please reread the question for

14   the witness.

15          COURT REPORTER:  "And those concepts are the ones

16   that are included in the -- the Byron Katie, Arin Reeves and

17   other persons that you mentioned before?"

18   A.    No, as asked.

19   BY MR. VINT:

20   Q.    At any point did you indicate to Cy Wakeman, Inc. that

21   the -- or any person with Cy Wakeman, Inc. that your

22   contributions to Reality-Based Diversity & Inclusion were not

23   considered a product of your employment at Cy Wakeman, Inc.?

24   A.    I didn't need to make that clarification so, no.  Everyone

25   employed in our organization was very well aware that Cy

1    Wakeman's -- and she's testified to it today -- that her

2    experience is in the field of leadership and account- -- and

3    personal accountability and has nothing to do with diversity

4    and inclusion.

5        And my resume is public information, as you stated, on

6    LinkedIn so, no, I would have not needed to make that

7    clarification.

8    Q.   Did you make any qualification in your work on

9    Reality-Based Diversity & Inclusion in the PowerPoint

10   presentation for any work that was exclusively yours?

11   A.   So, no, because in the PowerPoint presentation as

12   delivered to Great Western Bank in those six times, I quoted

13   every single person I'd gotten the work from, and when I was

14   talking about the effectiveness training, which is my personal

15   work created with Mary Beth Ebmeyer, I didn't feel the need to

16   say that it was my work because it is.

17   Q.   As you sit here today, do you allege that the work you

18   provided for Cy Wakeman, Inc. in creating Reality-Based

19   Diversity & Inclusion was not work for hire?

20   A.   That is my assertion, yes.

21   Q.   You will -- you claim that the PowerPoint presentation

22   Reality-Based Diversity & Inclusion was not work for hire

23   during your time as an employee of Cy Wakeman, Inc.?

24            MR. HIGH:  Objection, foundation.

25            THE COURT:  Overruled.  If she knows.

1          THE WITNESS:  Will you repeat the question?

2          COURT REPORTER:  "You will -- you claim that the

3     PowerPoint presentation Reality-Based Diversity & Inclusion was

4     not work for hire during your time as an employee of Cy

5     Wakeman, Inc.?"

6     A.    Delivering the content, speaking on behalf, combining my

7     diversity work with her leadership work was part of my

8     employment.  Giving her my life's experience in the field of

9     diversity and inclusion was not part of my employment.  I was

10    not paid to do that.

11    BY MR. VINT:

12    Q.    Do you have any agreements that indicate that?

13    A.    I don't have any agreements that don't indicate that.

14    Q.    Your book includes the work of Byron Katie, correct?

15    A.    My -- my work does not include the work of Byron Katie.

16    My book includes one term that Byron Katie is associated with.

17    That term is "suffering is optional".

18    Q.    Does your book include the work of Arin Reeves?

19    A.    My book does include the work of Dr. Arin Reeves.

20    Q.    Does your book include the work of any of the other people

21    you cited earlier today?

22    A.    Yes.

23    Q.    Do you believe that the inclusion of that work voids the

24    copyright that you have filed on *Lively Paradox*?

25    A.    No, because I have permission to cite other authors.  The

Price - Cross                                                    38

1    work of C. H. Turner, for example, in 1910 was quoted by Martin

2    Seligman in 1970 and many other philosophers after such, and

3    it's very common in the field of academia to quote authors that

4    you reference and use their material.

5    Q.    Did you get permission from Mr. Turner?

6    A.    Mr. Turner has long since been dead.  No.

7    Q.    Is it your claim as you sit here today that a -- you're

8    allowed to use copyrighted material simply by asking permission

9    of any person who has quoted that person and not void or not

10   violate the -- the original copyright on that material?

11   A.    I'm sorry, I don't understand that question.

12              THE COURT:  I didn't either.

13              MR. VINT:  That's a terrible question.  Let me

14   rephrase.

15              THE COURT:  Okay.

16   BY MR. VINT:

17   Q.    As you sit here today, are you -- you just testified that

18   you sought out permission from someone who had quoted C.H.

19   Turner material, correct?

20   A.    No.  I quoted C. H. Turner.  I didn't request permission

21   from someone who quoted C. H. Turner.  I quoted C. H. Turner.

22   Q.    Perhaps I misunderstood your answer then.  My apologies.

23         Ms. Price, do you use concepts from Byron Katie, Arin

24   Reeves and other persons throughout *Lively Paradox*?

25   A.    Yes.

1   Q.   Did you use concepts from Byron Katie, Arin Reeves and

2   other persons throughout Reality-Based Diversity & Inclusion?

3   A.   So, when I was teaching --

4   Q.   Ma'am, it's a yes or no question.

5            THE COURT:  Not really.  It's a compound question.

6   So rephrase the question if you want it to be a yes or no.

7            MR. VINT:  Okay.  Thank you, Judge.

8   BY MR. VINT:

9   Q.   Did you use concepts from Byron Katie in creating

10  Reality-Based Diversity & Inclusion?

11       Let me rephrase again.  Did you use concepts from Byron

12  Katie in authoring Reality-Based Diversity & Inclusion?

13  A.   I used the words "suffering is optional" which is also

14  used in *Reality-Based Leadership* which is associated with Byron

15  Katie.

16  Q.   Okay.  Did you use concepts from Dr. Arin Reeves in

17  authoring Reality-Based Diversity & Inclusion?

18  A.   Yes.  Point of clarification, Dr. Arin Reeves does not own

19  the idea of subconscious bias.  Subconscious bias is a

20  psychological condition.  Dr. Arin Reeves, I'm just using her

21  table to help illustrate power structures and subconscious

22  bias, but she is not the creator of that concept in the way

23  that I use it.

24  Q.   So Dr. Arin Reeves took an existing concept and put her

25  own -- or his or her own spin on it, correct?

1    A.    She created a table that helps to illustrate power

2    structure.

3    Q.    And then you took that table and removed some of the items

4    from it and put it into your Reality-Based Diversity &

5    Inclusion; is that correct?

6    A.    That is not correct.  I took that table and made

7    adjustments to it so I could use it in my capacity as the

8    President of the Hallmark African-American Leadership Council

9    circa 2007, 2008 and also in several other diversity and

10   inclusion sessions that I conducted as a member of the

11   Diversity and Inclusion Council at Hallmark Cards.

12        When I combined my diversity work with Cy Wakeman's

13   leadership work as part of Reality-Based Diversity & Inclusion,

14   that same table was used per permission from Dr. Arin Reeves.

15   Q.    I'm going to go ahead and ask the question one more time.

16   Did you use the table that Dr. Arin Reeves prepared with your

17   own changes to it in Reality-Based Diversity & Inclusion?

18   A.    That's a different question.  The answer's yes.

19   Q.    Did you use that exact same table in *Lively Paradox*?

20   A.    With credit to Dr. Arin Reeves, yes.  That credit I had to

21   take out when I worked for Cy Wakeman at Reality-Based

22   Leadership.

23   Q.    Is it your claim as you sit here today that your use of

24   principles from *Reality-Based Rules of the Workplace* in *Lively*

25   *Paradox* were principles that you had created or learned of

1    prior to your employment with Wakeman, Inc.?

2    A.    I'm not sure what principles you're meaning.  There are

3    five specific rules of the workplace.  Can you be specific?

4    Q.    Well, on page 50 of *Lively Paradox*, you state that the

5    opposite of personal accountability is learned helplessness.

6    We've --  You talked about that during your -- your testimony.

7          On page 82 of *The Reality-Based Rules of the Workplace* --

8          THE COURT:  Wait a minute.  Let's go -- let's go one

9    at a time.

10         MR. VINT:  Sure.  I'm just citing the page from the

11   other book, Judge.

12   BY MR. VINT:

13   Q.    On page 82 of *Reality-Based Rules of the Workplace* -- on

14   page 82 of *Reality-Based Rules of the Workplace*, Wakeman

15   writes, quote, One of the best ways it depends on personal

16   accountability is to recognize and comprehend its opposite,

17   learned helplessness.

18         As you sit here today, are you claiming that you knew of

19   the concept of learned helplessness prior to your employment

20   with Wakeman?

21   A.    Yes, I learned of the concept of learned helplessness

22   watching the show *A Different World*.  I also learned of the

23   concept of learned helplessness through my master's program and

24   common knowledge in the field of psychology.

25   Q.    Did *A Different World* talk about the relationship between

Price - Cross                                                          42

```
 1    personal accountability and learned helplessness as you do in
 2    Lively Paradox and as Wakeman does in The Reality-Based Rules
 3    of the Workplace?
 4    A.    I don't remember.  I was about 13.
 5    Q.    Had you read Reality-Based Rules of the Workplace prior to
 6    working for Wakeman?
 7    A.    No.
 8    Q.    Had you read the --
 9    A.    It didn't exist.
10    Q.    Had you read Reality-Based Leadership at that time?
11    A.    I had not read the entire book, no.
12    Q.    Okay.  You mentioned that Reality-Based Rules of the
13    Workplace didn't exist at the time that you were hired?
14    A.    That's correct.
15    Q.    So if there are any concepts in Reality-Based Rules of the
16    Workplace that were used in Reality-Based Diversity & Inclusion
17    or for that matter Lively Paradox, they would have been
18    reviewed by you during your employment with Wakeman or after,
19    correct?
20    A.    No.
21    Q.    That's not correct?
22    A.    No.
23    Q.    Did you have an advance copy of the book?
24    A.    No.  Because you can't claim ownership to things that are
25    psychological terms, things that were used in religious context
```

Price - Cross                                                          43

1    and things that have been around for centuries.

2    Q.   But, Ms. Price, you filed a copyright on your book,

3    correct?

4    A.   I -- I did.  My book is a compilation of my personal

5    stories and of my life, my experiences with some adages, maybe

6    a sentence or two from other authors.

7    Q.   If you're going to sit here and claim that you can't claim

8    ownership of other people's work, why did you copyright other

9    people's work in your book?

10   A.   My book is not other people's work.  You asked about other

11   people's work, but if you had an opportunity to read my book,

12   you would see that I talk about my experience as a child, I

13   talk about my experience with my father, I talk about my

14   experience being excluded as an engineer who doesn't act like

15   an engineer, I talk about my experiences at a historically

16   black college and understanding what it was like for a

17   nonminority student working there.

18        I talk about what it looks like to be a different person

19   from a personality standpoint.  There's only 3 percent of the

20   people in the world who happen to be the same gender as me, who

21   type as the same Myers Briggs.  So when I'm talking about my

22   life's experiences around diversity and inclusion, I felt it

23   was appropriate to copyright it.

24   Q.   You talked about those same experiences when you worked

25   for Wakeman too, didn't you?

Price - Redirect                                                    44

```
 1   A.    Did I talk about my life's experiences when I worked for
 2   Cy Wakeman?
 3   Q.    Let me rephrase the question.   In your presentations as an
 4   employee of Cy Wakeman, isn't it true that you talked about
 5   those exact same experiences?
 6   A.    That is not true that I talked about those exact same
 7   experiences.
 8              MR. VINT:  Okay.  Nothing further, Your Honor.
 9              THE COURT:  All right.  Very well.  Redirect.
10              MR. HIGH:  Briefly, Your Honor.
11                        REDIRECT EXAMINATION
12   BY MR. HIGH:
13   Q.    Ms. Price, there were some questions about your LinkedIn
14   page?
15   A.    Yes.
16   Q.    Did you author the entire page yourself or did somebody
17   else do it for you?
18   A.    Someone else helped to -- to frame it.  So when I first
19   started working for Wakeman, I was using my LinkedIn page just
20   as most people do, but once I started working for Wakeman, it
21   needed to be more like a speaker, and so per the suggestion of
22   Ford Saeks, who owns Prime Concepts, paid for by Wakeman, he
23   suggested to our staff, including Cara Teal, who was my
24   assistant at the time, that every single event we do that we
25   should put it on there, that we, like, spoke for the Society of
```

Price - Redirect                                                          45

 1    Human Resources or that we went into an organization and taught

 2    on the topic so that it was constantly dynamic and didn't

 3    appear static.

 4         And so Cara is the person -- until she was terminated or

 5    left Wakeman, I can't remember which -- is the person who

 6    maintained my LinkedIn profile.  I did not maintain it myself.

 7    Q.    The portion that Mr. Vint questioned you about prior to,

 8    you didn't write that on your LinkedIn profile, did you?

 9    A.    I did not.

10    Q.    It was done by a company hired by Wakeman to create the

11    content?

12    A.    Prime Concepts was the one who told us to change the way

13    the website -- I mean, the LinkedIn profiles looked, and Cara

14    Teal, who was my assistant, did it for me.

15    Q.    Okay.  How long have you been in the field of leadership

16    would you say?

17    A.    I got my first leadership assignment in '99, but in

18    leadership development specifically, 2009.

19    Q.    How long have you been teaching leadership exclusively to

20    others for profit?

21    A.    For myself?

22    Q.    Yeah.

23    A.    I made -- I got my first check in September of 2016.

24    Q.    Let me ask you a different question.  How long has

25    leadership been your primary function professionally?

Price - Redirect                                                          46

1    A.    Leadership -- leading other people?

2    Q.    Yes.

3    A.    Since 1999.

4    Q.    Okay.  You mentioned psychology in relation to leadership?

5    A.    Yes.

6    Q.    And religion in relation to leadership?

7    A.    That's correct.

8    Q.    Would you say that leadership is a combination of

9    religious principles, psychological principles and anything

10   else?

11   A.    Yeah.  So, I am a Christian.  I don't remember when I

12   wasn't a Christian.  So most of the leadership concepts that I

13   know I learned in church at a very young age and so that's the

14   lens through which I see leadership development.  I don't

15   particularly teach it that way, but I believe that Christian

16   principles are a good way to lead, yes.

17   Q.    Okay.  Leadership as a discipline involves psychological

18   concepts and religious concepts?

19   A.    That's correct.

20   Q.    Okay.  Have you ever taken a class on copyright law?

21   A.    I have not.

22   Q.    Are you aware of the term of art in U.S. juris prudence

23   "for hire" under copyright law?

24   A.    I'm aware of the term.  I couldn't tell you exactly what

25   it means.

1          MR. HIGH:  I have nothing further, Your Honor.

2          THE COURT:  All right.  Very well.  May this witness

3    step down?

4          MR. HIGH:  Yes, Your Honor.

5          MR. VINT:  Yes, Your Honor.

6          THE COURT:  All right.  Very well.  You may step

7    down.  Thank you.

8        (This concludes the testimony of Nicole Price.)

9

10                    *  *  *  *  *  *  *

11

12

        I certify that the foregoing is a correct transcript from
13    the record of proceedings in the above-entitled matter.

14
          _/s/Rogene S. Schroder_          January 11, 2018
15          Rogene S. Schroder, RDR, CRR              Date

16

17

18

19

20

21

22

23

24

25

```
 1                              I-N-D-E-X

 2                                      Direct   Cross   Redirect

 3     WITNESSES:
       FOR THE DEFENDANT:
 4
       Nicole Price                        2       26       44
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```